**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Howard R. Tallman**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **RICHARD K. SEARS,** | ) | **Case No. 15-13389 HRT** |
| | ) | **Chapter 7** |
| **Debtor.** | ) | |
| | ) | |
| | ) | |
| **LYNN MARTINEZ, Chapter 7 Trustee,** | ) | **Adversary No. 15-1257 HRT** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD K. SEARS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER ON ADVERSARY COMPLAINT**</u>

This case comes before the Court for trial of Plaintiff's *Complaint for Denial of Discharge Pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5)* (docket #1).

<u>I.  FACTS</u>

<u>A.  Stipulated Facts</u>

The following facts were stipulated to by the parties in their joint *Pretrial Statement* (docket #24) filed with the Court on February 19, 2016.

1.   Richard K. Sears (the "Debtor") filed for relief under Chapter 7 of the Bankruptcy Code on or about April 2, 2015 (the "Petition Date").

2.   The Debtor is an individual whose dwelling house or usual place of abode, according to his Petition in this case, is at 223 Nyberg Rd., Pueblo, CO 81006-9603.

3.   Plaintiff Lynn Martinez is the duly appointed Chapter 7 Trustee in the Debtor's bankruptcy case ("Plaintiff" or "Trustee").

4.   The Debtor is the sole shareholder, officer and director of Apache Park Land & Cattle Company, Apache Park Livestock, Inc., Private Land Bucks and Bulls, Inc., and Rocky Mountain Romangus, Inc.

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

5.     The Debtor is a shareholder, officer and director of Trophy Outfitters, Inc.

6.     The Debtor has provided QuickBooks ™ entries for 2008 through early 2015 for the Debtor and Apache Park Livestock, Inc., Private Land Bucks and Bulls, Inc., Rocky Mountain Romangus, Inc. and Trophy Outfitters, Inc.

B.  Evidence At Trial

At trial, the parties stipulated to the admission of  all proffered exhibits:  Plaintiff's Exhibits 1 through 16 and Defendant's Exhibits A through U.  Plaintiff's Exhibit 17 and Defendant's Exhibit V were offered and admitted during the trial.

Mr. Sears has a 7th grade education and no formal accounting training. He has worked picking fruit, in dehydration factories, and as a professional musician, recording artist and studio musician.  At the end of 1971, he moved to Denver.  He continued to work as a musician in Denver nightclubs, and did drywall work during the day.  In 1975, Debtor entered into the outfitting business which he continues to operate today.  Debtor moved to Montrose, Colorado, in 1978 and bought a restaurant-lounge which he operated until 1986.  In 1983, he leased land for both hunting and grazing cattle.  He started by pasturing cattle owned by others but, later, started acquiring his own cattle.  In 1996, he changed his selection of bulls to the Romagnola breed, which yielded more profit than the Angus breed.  According to Mr. Sears, the Angus breed is susceptible to pulmonary artery pressure which is a problem with pasturing at high altitude.  Mr. Sears began to cross Romagnola bulls with Angus cows.

Mr. Sears operated his cattle and hunting businesses beginning in 2004 through five companies:  Apache Park Land & Cattle Company, Apache Park Livestock, Inc., Private Land Bucks and Bulls, Inc., Rocky Mountain Romangus, Inc. and Trophy Outfitters, Inc. (the "Companies").  Mr. Sears was the sole shareholder, office and director of the Companies, with the exception of Trophy Outfitters, in which he is a 70% shareholder.  Mr. Sears testified that he made the business decisions for the Companies.

Neither Mr. Sears' wife, Erna Sears, nor his son, Matthew Sears, were officers, shareholders or directors of any of the Companies.  Other than Erna Sears performing some bookkeeping for Rocky Mountain Romangus, neither had any role in the businesses.  Matthew Sears is 28 years old.  He is disabled and Mr. Sears provides his support.

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

Mr. Sears started, managed and owned the Companies and made the financial decisions. The Companies generated a total of $9,294,429.00 in income from 2008 to 2015:

| | |
|---|---|
| $299,050.00 | Apache Park Land & Cattle Company |
| $1,727,444.00 | Apache Park Livestock |
| $272,461.00 | Private Land Bucks and Bulls |
| $3,516,533.00 | Rocky Mountain Romangus, Inc. |
| $3,478,941.00 | Trophy Outfitters |
| $9,294,429.00 | |

Exhibit 8.

A portion of the Companies' revenues was generated by entering into cattle investment contracts, described more fully below. Thus, through the Companies, Mr. Sears attracted $6,489,750.00 from cattle contract investors between 2008 and early 2015 .

| | |
|---|---|
| $2,217,000.00 | Rocky Mountain Romangus; contracts entered into 2011-2012 |
| $330,000.00 | Apache Park Livestock; contracts entered into 2008-2009 |
| $2,382,800.00 | Private Land Bucks and Bulls; contracts entered into 2009-2012 |
| $1,559,950.00 | Trophy Outfitters; contracts entered into 2013-2014 |
| $6,489,750.00 | |

Exhibit 10.

Mr. Sears stipulated to the following description of the cattle contracts in a 2013 plea agreement:

The defendant's hunting business operated in Colorado and New Mexico. He solicited customers to travel to these two states to hunt big game such as elk, deer, and bear. The cost of hunting packages ranged from approximately $2,000.00 to $10,000.00. The defendant accepted payment via cash, check and credit card.

The defendant operated the livestock businesses in Colorado. He solicited various investors and would act on their behalf to purchase herds of female cows commonly known as mother cows. Once a herd was purchased, the cattle were immediately leased to the defendant. Over the course of the contract period, the defendant maintained full control of the herd and had responsibility for caring for, maintaining, and breeding the mother cows. During the contract period the defendant was entitled to the herd's offspring which he would either sell or use to breed additional offspring. In exchange for this arrangement, the investors received an annual leaseback payment from the defendant.

Exhibit 15, exhibit 1 attached, Plea Agreement Criminal Action No. 13-cr-00180-MSK, *United States of America v. Sears*.

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

The cattle leases were for three or five-year terms. The herd owner was to receive an annual return of either ten percent of principal or a ten percent increase in his or her herd. The purchase amount was to be returned on the termination date, with an option by the herd owner to extend for another three-year contract.

At the end of 2011, extreme drought conditions occurred and it was necessary to find more pasture. The drought was followed by hard winters. These conditions caused calf losses and required additional hay purchases at high prices. The Companies attempted to grow hay, but this endeavor was unsuccessful due to inadequate irrigation water allocations. At the end of 2012, when the Companies had the highest herd number of 300 mother cows and 1200 heifers, the herd was quarantined by the Colorado Veterinarian due to trichomoniasis, a bovine venereal disease. This disease causes spontaneous abortions. By November 2014, the state veterinarian required that all cows that were not 120 days pregnant be red-tagged and sold for slaughter or, in the alternative, isolated after trichomoniasis testing of the cows and bulls. This process was prohibitively expensive and, as a result, the herd was sent to slaughter at a significant loss.

One of the herd owners, Mickey Hunt, filed a replevin action in Pueblo County District Court in the spring of 2014 and on May 2, 2014, the Court entered a replevin order under which 592 animals were sold in October 2014 for $609,544.16. In addition, 116 cows had been sold between October 2013 and January 2014 by Mr. Hunt, for a total of $108,935.38. By order dated August 2, 2015, the court awarded the proceeds of these sales to Mr. Hunt.

Mr. Sears continued to enter into cattle leasing contracts through the Companies. The last contract was entered into on December 31, 2014 by Trophy Outfitters. (Exhibit 10). On his original Schedule F of unsecured debt, Mr. Sears listed a total of $6,375,996.80, primarily owed to individuals on herd owner cattle contracts.[1]

Mr. Sears failed to file income tax returns for 2004 through 2009. A criminal case was filed against him in 2013 by the Tax Division of the Department of Justice. In connection with this prosecution, he entered into a plea agreement in December 2013 under which he admitted to willful failure to file the returns and agreed to a guilty plea and to make restitution in the amount of $278,274.00. (Exhibit 15).

In the plea agreement, Mr. Sears also admitted that the IRS assessed back taxes against him several times in the 1990s and filed Notices of Federal Tax Lien. During this time, he purchased real property in Parker, Colorado, in his wife's name. But he controlled the property, resided on the property and paid most of the significant property expenses. He admitted that he knew at the time that he owed back taxes. In February 2006, Mr. Sears' research indicated that

---

[1] Four subsequent amendments to Schedule F added one additional $55,000.00 cattle contract liability.

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

the tax liens were about to expire.  Two months after the IRS released the last lien, Mr. Sears
caused the property to be quitclaimed into his name.   Mr. Sears admitted that his intent was to
frustrate the IRS tax collection efforts.

　　　To assist in his defense of the anticipated criminal matter, Mr. Sears employed CPA
Michael Arvin in July, 2010.  At that time, the Companies had no conventional books and
records other than check registers and bank accounts for each of the Companies.  Mr. Arvin
obtained the Companies' bank statements, deposit and payment items, and created QuickBooks
entries from those sources.

　　　Mr. Arvin's fees were paid by the Companies even though no charges were brought
against them; $10,000.00 by Private Land Bucks and Bulls in August 2012 and $23,000.00 by
Rocky Mountain Romangus from July 2012 through January 2013.

　　　At the time Mr. Sears was sentenced in the criminal case, in October of 2014, Mr. Arvin
transferred the QuickBooks files to Mr. Sears' new accountant, Patricia Woods.  Ms. Woods had
been employed late in 2013 or early 2014.  She reworked the QuickBooks entries to reflect more
accurately the nature of the expenditures of the Companies.  The Companies did not have a
complete set of bank statements, so she obtained the statements from the banks.

　　　Mr. Sears received shareholder distributions or draws from the Companies from 2009 to
the Petition Date totaling approximately $1,843,775.00:

| | |
|---|---|
| $994,902.00 | Rocky Mountain Romangus |
| $455,661.00 | Trophy Outfitters |
| $67,797.00 | Private Land Bucks and Bulls |
| $253,302.00 | Apache Park Livestock |
| $72,113.00 | Apache Park Land |
| $1,843,775.00 | |

　　　In addition, the Companies paid another $235,356.00 to Mr. Sears, his wife Erna Sears
and his son Matthew Sears as contract laborers from 2010 into 2015, despite the fact that Erna
and Matthew had little or no role in the Companies.  (Exhibit E, p. 32; Exhibit I p. 32, Exhibit L,
p. 11).

　　　Total owner draws and contract labor payments to family members from 2009 to the
Petition Date were $2,079,131.00.  In addition, significant deposits were made to a personal
checking account which were not reflected as draws on the Companies' books and records,
including  $17,000.00 on December 26, 2014, and $110,000.00 on January 9, 2015, bringing the
total to $2,206,131.00.  (Exhibit 6 and Exhibit 9).  A spread sheet showing the shareholder
distributions and contract labor payments is attached hereto.

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

Mr. Sears also received a series of expense reimbursements from the Companies.

| | | | |
|---|---|---|---|
| $2,000.00 | Private Land Bucks and Bulls | Oct. 15, 2014 | Exhibit G, p.58-59 |
| $2,900.00 | Private Land Bucks and Bulls | 2012-2013 | Exhibit H, p. 18 |
| $30,285.00 | Rocky Mountain Romangus | 2011-2012 | Exhibit I p. 41 |
| $6,600.00 | Trophy Outfitters | 2013-2014 | Exhibit J, p. 76 |
| $41,785.00 | | | |

These reimbursements were made by check payable to Mr. Sears, but there was no evidence of the path of these funds. Mr. Sears had no personal bank account during most of this period. Even when he did, the check drawn by Apache Park Livestock on October 15, 2014 does not appear in the check register or statements for that account.

Mr. Sears testified that his personal expenses in unspecified amounts were also paid from the Companies' checking accounts prior to 2015, including expenses for household, medical, insurance, farm rent, utilities, fuel, vehicles, lodging and food. A number of these expenses were paid directly by company debit card.

## II.  DISCUSSION

The Complaint states two causes of action under 11 U.S.C. § 727(a). The Trustee asserts that the Debtor's discharge should be denied under § 727(a)(3) because the Debtor failed to keep recorded information from which his financial condition or business transactions could be ascertained and, under § 727(a)(5), because the Debtor has failed to explain satisfactorily the loss or deficiency of his assets to meet his liabilities.

A party objecting to a discharge need only prove one of the grounds for non-dischargeability under § 727(a) because these provisions are phrased in the disjunctive. *In re Garland*, 417 B.R. 805, 810-11 (B.A.P. 10th Cir. 2009) ) (cited by this Court in *Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711, 718 (Bankr. Colo. 2013)).

A.  Denial of Discharge under § 727(a)(3)

The court shall grant the debtor a discharge, unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

information, including books, documents, records, and papers, from which the
debtor's financial condition or business transactions might be ascertained, unless
such act or failure to act was justified under all of the circumstances of the
case . . ..

11 U.S.C. § 727(a)(3).

The purpose of section 727(a)(3) is to give creditors and the bankruptcy
court complete and accurate information concerning the status of the debtor's
affairs and to test the completeness of the disclosure requisite to a discharge. The
statute also ensures that the trustee and creditors are supplied with dependable
information on which they can rely in tracing a debtor's financial history.

*Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3rd Cir. 1992).

The Trustee must establish a *prima facie* case for denial of discharge by demonstrating
that Mr. Sears "failed to maintain and preserve adequate records and that the failure made it
*impossible* to ascertain his financial condition and *material business* transactions." *Gullickson v.
Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (citing *In re Folger*, 149 B.R.
183,1188 (D. Kan 1992)). *See also Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615
(B.A.P. 10th Cir. 2001). Once the Trustee shows a *prima facie* case, the burden shifts to the
Debtor to come forward with an explanation for the lack of recorded information. *PNC Bank v.
Buzzelli (In re Buzzelli)*, 246 B.R. 75, 116 n.17 (Bankr. W.D. Pa. 2000) (cited by this Court in
*McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 241 (Bankr. Colo 2005)).

Records are adequate if they "sufficiently identify the transactions that intelligent inquiry
can be made respecting them." *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (B.A.P.
10th Cir. 2001) (quoting *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939)) (cited by this
Court in *Phouminh*, 339 B.R. at 241; *Blackwell Oil Co. v. Potts*, 501 B.R. at 719).
"Considerations which are relevant in evaluating the adequacy of debtor's records include the
debtor's occupation, financial structure, education, experience, sophistication, and any other
circumstances that should be considered in the interest of justice." *In re Strbac*, 235 B.R. 880,
882 (B.A.P. 6th Cir. 1999) (cited by this Court in *Blackwell Oil Co. v. Potts*, 501 B.R. at 719).

Mr. Sears had no personal bank account until he opened checking account XXXX-4138
at Wells Fargo Bank on April 21, 2014 (the "Wells Fargo Account"). (Exhibit 6). Mr. Sears
testified that his personal bills were paid by check. However, the Wells Fargo Account
statements for the period between April 21, 2014, through April 23, 2015 – the full period during
which the account was active – show a grand total of 32 transactions. Of that total, there were
eight deposits, sixteen checks or withdrawals, and nine service or overdraft fees. The Court has
reviewed countless bank statements over the years. The Wells Fargo Account statements contain
a fraction of the number of transactions that the Court is accustomed to seeing on a normal

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

family bank account statement.  There is almost no useful information in the Wells Fargo
Account statements and the Court's review of those statements confirms the Trustee's testimony
that, from the information contained therein, it was impossible to trace and confirm the Debtor's
reported Schedule I income and Schedule J expenses.  Nor did the Defendant provide personal
credit card statements that could have been of assistance to the Trustee in tracking the
Defendant's reported expenditures.

Mr. Sears testified that he kept a check register with duplicate copies of the checks on
which he wrote explanatory notes, but this register was not provided at trial. Ms. Woods made
QuickBooks entries for the Wells Fargo Account, but only for the period from September 23,
2014, to December 30, 2014.  (Exhibit 6).  Only ten transactions are shown on this register, four
of which are labeled "to be identified."  Many transactions shown on the bank statements are not
included in the register, including two deposits in April, 2014, of $25,150.00 and $10,000.00,
and withdrawals of $8,000.00 and $22,000.00 on April 23, 2014.  Mr. Sears could not identify
the transactions shown in the bank statements.

Various aspects of the Debtor's handling of his financial affairs warrant a higher standard
of record keeping for Mr. Sears as a prerequisite to discharge.

It appears that the Wells Fargo Account was used as a "pass through."  The bank
statements for the short period the account was open are sufficient to show that the Debtor made
significant deposits into the account followed by immediate withdrawals of approximately the
deposit amount.  (Exhibit 6).  This pattern is particularly apparent in the January 2015 activity in
the Wells Fargo Account.

Mr. Sears had a practice of obtaining cashier's checks to conduct his financial
transactions.  From time to time, he used cashier's checks for draws or intercompany transfers,
so that the funds would clear the bank more quickly.  This practice  makes the movement of
money difficult to trace. The funds held in cashier's checks in the Debtor's possession were not
on deposit in any bank account, and were beyond the reach of creditors.

Most notably, on January 9, 2015, the Debtor made an electronic deposit to the Wells
Fargo Account in the amount of $110,000.00 and a "withdrawal in store" for the same amount.
The withdrawal was in the form of a cashier's check payable to the order of Erna Sears.  The
QuickBooks account records erroneously show this as paid to Mr. Sears. (Exhibit 7).  He
retained possession of this cashier's check until March 18, 2015, when he redeposited the
cashier's check into the Wells Fargo Account.  On April 1, 2015, Mr. Sears again withdrew the
$110,000.00 from the Wells Fargo Account (entry again titled "withdrawal in store"), obtaining
a second cashier's check, this time payable to Rio Valle, LLC, an LLC nominally owned by Erna
Sears and which is the sublessor of the farm which Mr. Sears claims is his homestead in this
bankruptcy case.  Prior to this payment, the rent on the farm was paid not by Mr. Sears but by

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

Rocky Mountain Romangus directly to the owner, Stonewall Springs Quarry, LLC, and designated a "grazing lease." (Exhibit I, p. 49).

Another such circumstance is Mr. Sears' admission that he had approximately $80,000.00 in cash in a small safe at his residence in Parker, Colorado during a raid by the Colorado Division of Wildlife in late summer of 2010. Mr. Sears testified that the cash was from hunters.

The lack of intelligible financial information to be derived from Defendant's personal bank and credit card accounts is explained by the fact that the Defendant was in the habit of paying personal expenses from business accounts. He maintained separate checking accounts for his business entities and offered into evidence transaction detail in QuickBooks format. Transactions detail was submitted for Rocky Mountain Romangus, Inc., Apache Park Livestock, Inc., Private Land Bucks and Bulls, Inc., and Trophy Outfitters, Inc.

The QuickBooks format print-outs offered into evidence are not contemporaneously recorded business records. They are reconstructions created from bank statements. The Defendant testified that he uses two-part duplicate checks that create a copy of a bank check as it is written. He testified that he also records other details of transactions on the check copy at the time he writes the check. None of this backup information was offered into evidence.

The Debtor failed to produce evidence to explain the disposition of the money from his significant shareholder draws and other income he derived from the Companies. He did bring a large stack of boxes he alleged contained records of the Companies into the courtroom during the trial. They were not offered into evidence and have not been considered by the Court.

In *Phouminh* the Court previously observed that "(T)he focus of § 727(a)(3) is on the chapter 7 trustee and the creditors having access to recorded information that allows the trustee to administer the case and the creditors to protect their rights in the bankruptcy case." 231 B.R. at 241.

In this case, the Debtor's records are not adequate to identify transactions and allow the Trustee to make inquiry into them. Chapter 7 Trustee Lynn Martinez testified that she identified significant shareholder distributions to Mr. Sears from the Companies. Mr. Sears did not make her aware of any personal bank account prior to April 2014 when the Wells Fargo Account was opened. She could not find records of the deposit of the shareholder distributions into the account. The banking entries shown as "unidentified" on the register have not been explained by the Debtor. It was evident to her that Mr. Sears ran his personal business transactions through the Companies' accounts.

Ms. Martinez was unable to determine what assets might have been purchased with the shareholder distributions. Mr. Sears did not provide her with any personal financial records

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

other than Wells Fargo Account statements from April 2014 to April 2015 and the incomplete
registers for that account. Those records were not sufficient to allow the Trustee to track
Schedule J expenses or determine Mr. Sears' financial condition.

The Trustee noted that Mr. Sears conducted his business affairs in cash so that money
came in and was immediately withdrawn from his bank account. His major business
transactions were not run through his personal bank account. The Trustee was unable to identify
purchases of assets or preferential payments to creditors due to the nature of activity reflected on
the Wells Fargo Account and general lack of other records. She was unable to tell from the
Companies' records how the owner draws were used and was unable to track payments to
creditors. The Trustee's inability to track expenditures made by Mr. Sears made it difficult to
administer his estate.

The only documents produced by Mr. Sears to explain his personal financial affairs are
the incomplete check register and bank statements for the Wells Fargo Account. The Trustee
was unable to determine Mr. Sears' financial condition and financial transactions from this
limited information.

The Debtor provided financial information from the Companies that reflected expenses
paid by the Companies on Mr. Sears' behalf commingled with legitimate company related
expenditures. This information did not satisfy Mr. Sears' record keeping obligations under
§ 727(a)(3). Absent sufficient documentation to clearly separate out those payments made on the
Debtor's behalf from company expenses, the Court finds those records inadequate to allow the
Trustee to ascertain Mr. Sears' financial dealings.

The Trustee has met her burden to support her request to deny Mr. Sears' discharge under
11 U.S.C. § 727(a)(3) and Mr. Sears has failed to provide the Court with information to justify
the lack of adequate business records under the circumstances of this case.

B.  Denial of Discharge under § 727(a)(5)

The court shall grant the debtor a discharge, unless . . . the debtor has failed to
explain satisfactorily, before determination of denial of discharge under this
paragraph, any loss of assets or deficiency of assets to meet the debtor's
liabilities . . ..

11 U.S.C. § 727(a)(5).

The Trustee has the burden of proving facts establishing the actual occurrence of a loss or
shrinkage of assets. 11 U.S.C. § 727(a)(5). Once this initial burden of proof is met, the burden
shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner. *In re
Stewart*, 263 B.R. at 618 (cited by this Court in *Phouminh*, 339 B.R. 231, 247-8.)

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

"Once the party objecting to discharge has satisfied its burden of showing that the debtor possessed assets that have not been accounted for, the debtor's explanation for a diminution of assets must be specific and corroborated.  An explanation of the debtor's circumstances in general terms that is merely suggestive of reasons that assets became depleted falls short of the mark."  *Bell v. Stuerke (In re Stuerke)*, 61 B.R. 623, 626 (B.A.P. 9th Cir. 1986) (cited by this Court in *Phouminh*, 339 B.R. at 248).  "Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory."  *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).

Section 727 evidences a strong public policy that a discharge of debt is extraordinary relief that must not be granted in the absence of absolute transparency of the debtor's affairs.  *In re Riccardo*, 248 B.R. 717, 723-24 (Bankr. S.D. N.Y. 2000).  This Court has previously observed that

> Under the provisions of § 727(a)(5), a debtor will not be granted a discharge where it appears to the court that the debtor should have had the resources available to deal fairly with creditors, but is unable to explain the disposition or loss of those assets.  A lack of detailed information as to the debtor's affairs prejudices creditors by making it difficult for the trustee to administer the estate and recover assets that may otherwise be recoverable for the benefit of creditors.  As well, a lack of transparency creates a cloud of doubt as to the true nature of the debtor's pre-petition activities.  Where the ability to maintain records and explain the loss of assets is fully within the debtor's control, it would be inequitable to grant a discharge to an individual who, by his or her own actions, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone.

*In re Phouminh*, 339 B.R. at 247.

As outlined above, Mr. Sears enjoyed extraordinary amounts of income for which he has not adequately accounted.  Disbursement of the funds in cash and to family members creates a cloud surrounding Mr. Sears' financial affairs.

The Debtor has not adequately accounted for cash he received from the Companies.  He had no bank account until April 2014.  Ms. Woods confirmed that the draws were often made in cash and often were paid directly by company check to Erna Sears or Matthew Sears.

Mr. Sears claims that some of the funds paid to him from one of the Companies were distributed to another of the Companies rather than retained by him individually.  In essence, he claims he merely facilitated intercompany transfers by first taking a payment from one company and then paying over those funds to another company.  If shown, this would account for only a small portion of the total payments to him that appear to be shareholder distributions.  No

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

evidence of these transfers was provided by Mr. Sears.  Both Mr. Arvin and Ms. Woods testified generally regarding intercompany transfers of cash and return to the Companies of distributions taken by Mr. Sears but that testimony was uncorroborated with documentation.  Ms. Woods mentioned a spread sheet of transfers, but it was not offered in evidence and no specific transactions were pointed out.  It appears that there were transfers from Mr. Sears to the Companies entered in the Companies' books.  (Exhibit 17).  However, many of the transfers were made in cash or cashier's checks, or by checks at a time when Mr. Sears had no bank account.  There is no adequate explanation for this method of moving money between the Companies.

Mr. Sears produced at trial a number of additional items from the Wells Fargo Account which had not previously been provided to the Trustee.  (Exhibit V).  These items show an additional cash deposit of $22,000.00 on April 23, 2014, not included in the QuickBooks register, and additional unexplained disbursements from the Wells Fargo Account to Erna Sears ($8,000.00 on April 3, 2014; $11,000.00 on October 15, 2014).  There are also several checks to vendors in relatively small amounts.  They do not fill in the blanks with respect to Mr. Sears' financial condition and affairs.

The Debtor's unsupported general statements about the nature of his personal expenditures is not a satisfactory explanation of the disposition of the money from the Companies.  He has provided no accounting of these distributions, but offers only vague explanations that the money went to pay bills or leases of a large cattle operation.  Notably, the Debtor offered no accounting of the substantial sums disbursed to Erna Sears as draws from the Companies and from the Wells Fargo Account.

The evidence shows that the Debtor received at least $2,206,131.00 drawn from the Companies from 2009 to the Petition Date.  Debtor's explanations for the disposition of these funds were vague and incomplete.  Because the Debtor has failed to offer an adequate explanation of the disposition of very substantial funds, the Court must deny the Debtor's discharge under 11 U.S.C. § 727(a)(5).

## III.  CONCLUSION

In accordance with the above discussion, it is

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

      **ORDERED** that Plaintiff's *Complaint for Denial of Discharge Pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5)* (docket #1) is hereby GRANTED.  The Debtor's discharge is hereby DENIED pursuant to 11 U.S.C. §§ 727(a)(3) & 727(a)(5).

      Dated this ___8th___ day of September, 2016.

                                              **BY THE COURT:**

                                              Howard R. Tallman, Judge
                                              United States Bankruptcy Court

ORDER ON ADVERSARY COMPLAINT
Adversary No. 15-1257 HRT

### SHAREHOLDER DISTRIBUTIONS/OWNER DRAWS - EXHIBIT 9

|  | RMR | TROPHY | PLBB | APACHE Livestock | APACHE Land | TOTAL |
|---|---|---|---|---|---|---|
| 2009 |  |  |  | 4606 |  |  |
| 2010 |  | 16100 |  | 62086 |  |  |
| 2011 | 291266 | 24173 |  | 15543 |  |  |
| 2012 | 526,691 | 8483 | 32,246 | 33918 |  |  |
| 2013 | 160487 * | 193048 * | 32246 | 114153 |  |  |
| 2014 | 16458 | 175,666 |  | 17789 |  |  |
|  |  | 28,000 |  |  |  |  |
| 2015 |  | 10191 | 3305 | 5207 | 72113 | Exh L p 9-11 |
| Total draws | 994902 | 455661 | 67,797 | 253302 | 72113 | 1843775 |

*Before Year-End Adjustments

### CONTRACT LABOR, EXHIBIT G P. 32

|  | RMR | TROPHY | PLBB | APACHE Livestock | APACHE Land | TOTAL |
|---|---|---|---|---|---|---|
| 2010 |  |  | Erna*** |  | 4500 |  |
|  |  |  | Matthew *** |  | 150 |  |
| 2011 |  |  |  |  |  |  |
| 2012 |  |  | Matthew** | 2250 |  |  |
| 2013 |  | **** 105223 | Richard | 45233 |  |  |
|  |  |  | Matthew** | 19000 |  |  |
|  |  |  | Erna | 44000 |  |  |
| 2014 |  |  |  |  |  |  |
| 2015 |  | **** 7500 | Richard | 2500 |  |  |
|  |  |  | Erna | 2500 |  |  |
|  |  |  | Erna | 2500 |  |  |
| Total Contract Labor |  | 112723 |  | 117983 | 4650 | 235356 |
| Grand Total |  |  |  |  |  | 2079131 |

**Exhibit I, page 32 "Matthew Sears"
*** Exhibit L, pge 11 "IC-Sears"
****Exhibit E p 32

Page 14 of 14